United States District Court
Southern District of Texas
**ENTERED**
February 10, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL CASE NO. 2:20-CR-01444 |
| | § | |
| JACOB BOONE WRIGHT | § | |

## MEMORANDUM OPINION AND ORDER

On July 15, 2020, Jacob Boone Wright and another passenger were sitting inside Wright's Toyota Corolla next to Glen Arbor Park when he noticed a Corpus Christi Police Department ("CCPD") patrol car pull up behind him with emergency lights engaged. Unbeknownst to Wright, a neighborhood resident had contacted the police and reported that Wright was selling drugs in the park.

As the police car came to a stop behind him, Wright exited the car as if to approach the officer. The officer immediately and repeatedly instructed Wright to get back in his car, but he refused to comply. The officer then instructed Wright to walk back to her patrol car and, once again, he refused to comply. Instead, he stood next to his car and began removing keys from his keychain, even though the officer instructed him to stop doing that.

The officer then walked Wright to the front of his car and attempted to place handcuffs on him, however, he resisted and started banging on the hood shouting instructions to the passenger who had remained in Wright's car. Wright was placed under arrest for resisting and a search of his vehicle discovered a pistol and narcotics.

Since Wright had a prior felony conviction, he was charged with felon in possession of a firearm.

Wright moved to suppress the firearm as evidence discovered from an investigatory stop and seizure that lacked the requisite reasonable suspicion. The Court denied that motion, and Wright appealed. The Fifth Circuit ruled that this Court had erred in its determination of when Wright was seized and remanded the case to this Court to provide written findings of fact and conclusions of law on whether reasonable suspicion existed when the police pulled behind Wright and ordered him to remain in his vehicle.

I.     **FINDINGS OF FACT**[1]

On July 15, 2020, a resident who lives adjacent to Glen Arbor Park noticed a stationary vehicle inside the park at the pavilion. (Tr. at 9:19–10:2). The resident called the police because he knew from experience that there was extensive drug dealing occurring in the park generally, and by that car, a gold Toyota Corolla, specifically. (Tr. at 10:23–11:7, 15:14–19). The resident "caller" did not give his name, address or telephone number to the police. (Tr. at 12:12–20, 33:6–8). It is common for callers to remain anonymous out of fear for their safety, especially if they are reporting criminal activity in a high crime area where they live. (Tr. at 45:3–13). CCPD did not attempt to locate the caller that day. (Tr. at 33:9–21).

---

[1]   The factual statements made herein should be considered as findings of fact regardless of any heading or lack thereof. Similarly, the legal conclusions, except where the Court discusses the various competing legal theories and positions, should be taken as conclusions of law regardless of any label or lack thereof.

The caller stated the following to the police dispatch officer:

> I told them that there was a gold Toyota Corolla that was at the pavilion doing a re-up, giving drugs to the transients that deal in that park and that they needed to come there and get them out of my park.

(Tr. at 16:19–22).

The caller was frustrated with the police's ineffectiveness in dealing with the crime and drug dealing around his home. (Tr. at 14:11–18). Reflecting this frustration, the caller relayed the following to the dispatch officer:

> I told them that I had my AR-15 locked and loaded with 31 rounds of armor-piercing weaponry and that if I needed to, I could do their job for them.

(Tr. at 14:20–24, 16:23–25).

The foregoing communication from the caller is a report of suspicious activity, or in this case, a suspicious vehicle report (as opposed to an emergency 911 call). A suspicious vehicle report begins when a member of the public contacts the police department and provides information to a dispatch officer, often called "dispatch" for short. (Tr. at 30:24–31:7). That information is evaluated by dispatch, and if in their opinion it should be acted upon, the dispatch officer confers with a lieutenant who reviews the information and makes the decision as to whether the information is reliable enough to warrant sending out an officer to investigate. (Tr. at 45:25–46:6). Dispatch then relays a summary of the caller's information, commonly referred to as a "call summary log," to a patrol officer who reviews the summary on a computer screen in their patrol car. (Tr. at 30:24–31:17).

3

In this case, that process played out and an incident call-out was made to Officer Riky Jakobsohn. Officer Jakobsohn was employed as a CCPD officer in mid-2018. (Tr. at 18:5–12). She regularly patrolled a district called "4 Charlie," which is near Glen Arbor Park. (Tr. at 18:21–19:8). She was very familiar with this area because she received three or four calls per 10-hour shift related to that area. (Tr. at 19:17–20:15). Those calls typically involve drug use and dealing. (Tr. at 20:25–21:4). Officer Jakobsohn further testified about "a few primary problems" in her patrol area. (Tr. at 21:11–17). One of those is a drug trafficking corridor near Glen Arbor Park where people pass back and forth between a few houses. (Tr. at 21:8–17).

On July 15, 2020, Officer Jakobsohn received a call-out from a dispatcher at 4:34 p.m., stating that "there was a suspicious vehicle over here dealing drugs" next to Glen Arbor Park. (Gov. Exh. 3 at 2:50–2:55); (Tr. at 19:9–16). A call summary log provided to Officer Jakobsohn from dispatch contained the following language: "SUSPICIOUS PEOPLE AT LOC[ATION]/RP ADV DRUG DEALERS/NO DRIVING CARS AT LOC[ATION]." (Def. Exh. 1). Additionally, the call summary log stated that a caller had provided the following information:

> [THE POLICE DEPARTMENT] NEEDS TO GET THESE DRUG DEALERS OUT OF HIS PARK
>
> DID THREATEN TO SHOOT SUBJ[ECTS] IF THEY DID SOMETHING THAT REQUIRED HIM TO DEFEND HIMSELF
>
> REF[USED] TO GIVE INFO ON HIMSELF
>
> ALSO [ADVISED] OF A GOLD COROLLA AT LOC[ATION]/IS ONE OF THE [SUBJECT'S] CARS

4

(Def. Exh. 1); (Tr. at 34:13–16, 35:10–16).  Officer Jakobsohn was also provided the address. (Def. Exh. 1); (Tr. at 49:7–9).

Officer Jakobsohn responded in approximately 10 minutes.  (Tr. at 11:10–13, 22:14–23:5, 37:15–22).  She immediately identified the suspicious vehicle confirming the color, make, model and location and pulled up behind it.  (Tr. at 22:14–23:5, 34:2–7, 37:23–38:3); (Gov. Exh. 2 at 0:11–0:31).  The caller watched the officer pull up and verified that she was behind the Corolla about which he had called.  (Tr. at 11:14–20).  Officer Jakobsohn did not know what the caller had said to dispatch other than the call-out and what was delivered on the call summary log.  (Tr. at 36:24–37:3).  She had not observed any drug dealing activity by anyone in the area at that time.  (Tr. at 39:18–24).

Upon arrival, Officer Jakobsohn noted that there were two occupants in the Corolla.  (Tr. at 23:6–9); (Gov. Exh. 2 at 0:31–0:38).  As she pulled to a stop, the driver, later identified as Wright, opened his car door and exited the car as if to approach her. (Tr. at 23:15–24:1); (Gov. Exh. 2 at 0:37–0:47).  Officer Jakobsohn immediately instructed Wright to remain in his vehicle.  (Tr. at 38:4–6); (Gov. Exh. 2 at 0:37–0:47); (Gov. Exh. 3 at 0:38–0:43).  In fact, Officer Jakobsohn instructed him to get back into his car *three* times, and each time Wright refused to comply.  (Tr. at 38:4–6); (Gov. Exh. 2 at 0:37–0:47); (Gov. Exh. 3 at 0:38–0:43).  One of the reasons someone exits a vehicle when a police officer approaches is to separate themselves from the car so the officer does not see inside it thereby potentially concealing evidence of criminal conduct.  (Tr. at 47:10–48:5).

As a result of Wright's refusal to get back in his car, Officer Jakobsohn instructed him to walk with her back to her patrol car.  (Tr. at 23:24–24:17); (Gov. Exh. 2 at 0:47–1:02);

5

(Gov. Exh. 3 at 0:44–0:58). This was her standard procedure once someone has exited a vehicle, and it is for everyone's safety to keep the individual from having access to anything in the car. (Tr. at 24:6–17). In this case, Officer Jakobsohn interpreted Wright exiting his car as an aggressive approach, and as previously stated, there was a passenger in the vehicle, so she was separating them to help control the situation. (Tr. at 24:13–17). Wright did not comply with Officer Jakobsohn's instruction to go with her to her patrol car; instead, he started taking keys off his keychain and refused to stop even though he was instructed to by Officer Jakobsohn. (Tr. at 24:21–25:4); (Gov. Exh. 2 at 0:47–1:36); (Gov. Exh. 3 at 0:58–1:36).

Officer Jakobsohn took Wright to the front of his car and attempted to place him in handcuffs, but Wright pushed against her and started banging on the hood shouting instructions to his passenger in the car. (Tr. at 25:8–26:4); (Gov. Exh. 2 at 1:34–2:08); (Gov. Exh. 3 at 1:32–2:11). Officer Jakobsohn saw Wright motion to his mouth in what appeared to be a signal to the passenger. (Tr. at 26:8–13). She recognized this as a common method to encourage someone to swallow drugs in order to destroy or conceal evidence particularly since she had been called to this area for suspected drug dealing and use. (Tr. at 26:14–19).

Officer Jakobsohn placed Wright in handcuffs and walked him to her police car. (Gov. Exh. 2 at 2:16–2:31); (Gov. Exh. 3 at 2:11–3:08). The officers patted him down for weapons and opened the back door of the car to place Wright inside. (Gov. Exh. 3 at 3:08–3:33). Instead of getting into the police car, Wright purposefully fell to the ground and said, "I'm f---ing tired of y'all harassing me." (Tr. at 27:17–21); (Gov. Exh. 3 at 3:30–4:06).

6

Wright was arrested for resisting and a subsequent inventory search of his vehicle revealed a pistol, synthetic marijuana, and non-prescription Xanax pills. (Tr. at 27:25–29:23).

## II.   PROCEDURAL HISTORY

On December 22, 2020, Wright was indicted by a federal grand jury for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Dkt. No. 8). On May 17, 2021, Wright filed a Motion to Suppress, (Dkt. No. 26), to which the Government responded on June 11, 2021, (Dkt. No. 30).

The Court held an evidentiary hearing on June 24, 2021. The Government presented testimony from the caller and Officer Jakobsohn. Wright did not call any witnesses. The Government placed three exhibits into evidence: (1) a map of the area in question, (2) dashboard-camera video from Officer's Jakobsohn's patrol car, and (3) body-camera video from Officer Jakobsohn. (Dkt. No. 60). Wright placed one exhibit into evidence: the call summary log for this event. (Dkt. No. 61). At the conclusion of the evidence and after hearing argument, the Court denied the Motion to Suppress and made oral findings of facts and conclusions of law from the bench.

On August 5, 2021, Wright pleaded guilty pursuant to a Federal Rule of Criminal Procedure 11(a)(2) conditional guilty plea, reserving the right to appeal the suppression ruling. (Dkt. No. 36); (Dkt. No. 38). On October 28, 2021, Wright was sentenced by the Court to 21 months in custody followed by a three-year term of supervised release. (Dkt. No. 45). He filed a Notice of Appeal on November 9, 2021. (Dkt. No. 47).

On January 18, 2023, the Fifth Circuit held that a seizure in this case had occurred "at the time the officer activated her emergency lights and almost simultaneously ordered him to stay in his car, which he continued exiting but stood beside." *United States v. Wright*, 57 F.4th 524, 527 (5th Cir. 2023). The Fifth Circuit found that this Court "conclud[ed] erroneously that the *Terry* stop was initiated instead at a later point in the encounter." *Id.*

Accordingly, the Fifth Circuit remanded the case to this Court for the limited purpose of "expeditiously providing written findings of fact and conclusions of law on whether reasonable suspicion existed when the Officer pulled behind Wright and ordered him to remain in his vehicle." *Id.* at 536. The Fifth Circuit further instructed that "the findings and conclusions are to be based on the record developed at the suppression hearing." *Id.*

### III. CONCLUSIONS OF LAW

Wright originally filed a Motion to Suppress arguing that the police "lacked any legal basis for the stop that resulted in discovery of the incriminating evidence; here, the firearm. There was no reasonable suspicion to conduct an investigatory stop based on the anonymous tip and insufficient on-scene corroboration or verification of the tip." (Dkt. No. 26 at 6). The Government responded arguing that "based on the totality of the circumstances, including the information in the tip, the observance of activity consistent with that information, the defendant's nervous reaction to the police, his unusual behavior, and his attempt to walk away, reasonable suspicion existed to justify a *Terry* stop." (Dkt. No. 30 at 6).

8

A.     THE LEGAL STANDARD FOR A DETENTION

This case implicates the Fourth Amendment to the United States Constitution, which provides in full:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "As that text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Lange v. California*, ___ U.S. ___, 141 S.Ct. 2011, 2017, 210 L.Ed.2d 486 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006) (internal quotation marks omitted)).

The Fourth Amendment prohibits unreasonable searches and seizures, and "applies to seizures of the person, including brief investigatory stops[.]" *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). An investigatory stop, however, does not violate the Fourth Amendment if it is supported by "reasonable suspicion." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002). These investigatory stops are commonly referred to as "*Terry* stops" because the rule derives from the case of that name, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The reasonable suspicion inquiry is both qualitative and quantitative; it depends "upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). A law

9

enforcement officer acts with reasonable suspicion if, based on the totality of the circumstances, she has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417–18, 101 S.Ct. at 695.

Reasonable suspicion "is a low threshold, requiring" only a "minimal level of objective justification[.]" *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (internal quotation marks omitted)). "Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *United States v. Alvarez*, 40 F.4th 339, 346 (5th Cir. 2022) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000); *United States v. Thomas*, 997 F.3d 603, 610–11 (5th Cir. 2021); *United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020); *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008). Facts that appear innocent when viewed in isolation can constitute reasonable suspicion when viewed collectively. *Arvizu*, 534 U.S. at 277–78, 122 S.Ct. at 753.

### B. REASONABLE SUSPICION

The Court finds that Officer Jakobsohn had a reasonable suspicion for the investigatory stop in this case when she pulled behind Wright and ordered him to remain in his vehicle. Based on the totality of the circumstances, the Court finds that Officer Jakobsohn had a particularized and objective basis for suspecting Wright of criminal activity at that time. Several factors support this conclusion, and the Court will address them in turn.

1.      **The Anonymous Call/Suspicious Vehicle Report**

First, there was the suspicious vehicle report from the anonymous caller, which ultimately led to the call summary log.² A call to 911 or to report suspicious activity "can sometimes supply reasonable suspicion, and we evaluate the individual circumstances of each case when making that determination." *United States v. Rose*, 48 F.4th 297, 302 (5th Cir. 2022) (citing *Vickers*, 540 F.3d at 361). The Supreme Court has provided three factors that, when weighed together, help determine whether an anonymous tip bears "adequate indicia of reliability." *Navarette v. California*, 572 U.S. 393, 398, 134 S.Ct. 1683, 1688, 188 L.Ed.2d 680 (2014). The Fifth Circuit generally refers to these factors as the "*Navarette* factors." *Rose*, 48 F.4th at 302. They include:

> [T]he informant (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing and voice recording.

*Wright*, 57 F.4th at 534 (quoting *Rose*, 48 F.4th at 534).

With respect to the first factor, whether the caller in this case asserts eyewitness knowledge of the reported event, the caller reported criminal and drug dealing activity he was witnessing right outside of his home. More specifically, the caller stated that he "noticed a vehicle that was parked inside the park at the pavilion." (Tr. at 10:1–2). The caller additionally stated that this vehicle was parked next to where he lived. (Tr. at 10:8–11). The caller further stated that Wright's car was a "goldish" Toyota Corolla. (Tr. at

---

²      The Court will discuss the call from the caller and the call summary log prepared by dispatch separately.

11

11:6–7). The caller's observations were corroborated. Therefore, the Court finds that the first factor of the *Navarette* test is satisfied because the anonymous caller's statements to dispatch demonstrate that he was an eyewitness to the event.

With respect to the second factor, whether the report is contemporaneous with the event, the Court finds that the caller made the suspicious vehicle report at the time the conduct was actually occurring, and not sometime later. Not only does the anonymous caller's testimony show that the report he made was contemporaneous with the event, Officer Jakobsohn arrived on scene within minutes and spotted the suspicious vehicle as described by the caller in the location the caller reported it would be. Therefore, the Court finds that the second factor of the *Navarette* test is satisfied because the anonymous caller's statements to dispatch were made contemporaneously with the event.

With respect to the final factor, it does not appear that the caller used the 911 emergency system. The caller chose to remain anonymous for safety reasons and because of a lack of faith that the police would actually address the ongoing criminal problem in his neighborhood. In fact, the police had to go door to door in the neighborhood to locate the caller to testify at the suppression hearing. (Tr. at 6:16–20). If the caller had used the 911 emergency system, the police could have used call tracing and voice recording to locate the caller.

Nevertheless, two out of the three *Navarette* factors weigh heavily in favor of finding that the suspicious vehicle report bore adequate indicia of reliability. This is important because Officer Jakobsohn generally knew the information provided by the caller because of a radio call-out from dispatch describing the call as well as the

information included in the call summary log.  In light of the foregoing, the Court finds that the anonymous call, the suspicious vehicle report, is reliable and weighs in favor of finding reasonable suspicion for an investigatory stop when the police pulled behind Wright and ordered him to remain in his vehicle.

> **2.     The Information in the Call Summary Log was Reliable and Verified by Officer Jakobsohn**

The Court also finds that the information in the call summary log was reliable and verified by Officer Jakobsohn.  The call-out from the dispatcher relayed that "there was a suspicious vehicle over here dealing drugs" next to Glen Arbor Park.  (Gov. Exh. 3 at 2:50–2:55); (Tr. at 19:15–16); *see also* (Def. Exh. 1).  The call summary log provided that the caller had relayed:

> [THE POLICE DEPARTMENT] NEEDS TO GET THESE DRUG DEALERS OUT OF HIS PARK
>
> DID THREATEN TO SHOOT SUBJ[ECTS] IF THEY DID SOMETHING THAT REQUIRED HIM TO DEFEND HIMSELF
>
> REF[USED] TO GIVE INFO ON HIMSELF
>
> ALSO [ADVISED] OF A GOLD COROLLA AT LOC/IS ONE OF THE [SUBJECTS] CARS

(Def. Exh. 1); (Tr. at 34:13–16, 35:10–16).  Officer Jakobsohn was also provided the address. (Def. Exh. 1); (Tr. at 49:6–9).

A few minutes later, Officer Jakobsohn identified the suspicious vehicle described in the call summary log and pulled up behind it.  (Tr. at 11:10–13, 22:14–23:5, 34:2–7, 37:15–38:3); (Gov. Exh. 2 at 0:11–0:31).  There was no other car matching the description of the suspicious vehicle in the area.  (Tr. at 44:13–15).  Officer Jakobsohn saw two

13

occupants in the Corolla. (Tr. at 23:6–9); (Gov. Exh. 2 at 0:31–0:38). Officer Jakobsohn knew from the call summary log that the caller had stated that this specific gold Corolla was suspected of dealing drugs at that time. Accordingly, Officer Jakobsohn personally verified the information in the call summary log.

The Court finds that the information in the call summary log was also reliable and weighs in favor of finding reasonable suspicion for an investigatory stop when the police pulled behind Wright and ordered him to remain in his vehicle.

### 3. Wright Exited His Vehicle Immediately when Officer Jakobsohn Pulled Behind Him

The Court also notes that as Officer Jakobsohn pulled to a stop behind Wright, he immediately exited the car and gave an indication that he would start walking toward her. (Tr. at 23:15–24:1); (Gov. Exh. 2 at 0:37–0:47). At that time, Officer Jakobsohn instructed Wright three times to get back in his vehicle, which he never did. (Tr. at 38:4–6); (Gov. Exh. 2 at 0:37–0:47); (Gov. Exh. 3 at 0:38–0:43).

In *United States v. Goodin*, the Fifth Circuit affirmed a finding that reasonable suspicion for an investigatory stop existed based on several factors including (1) that the stop had occurred along a section of Interstate 20 that was a "corridor for . . . traveling criminals" and (2) that the suspect in that case had "immediately exited his vehicle upon being pulled over, an action that made [the officer's] 'hair stand up' because it presented safety concerns and suggested Goodin was trying to keep him away from the car." 835 F. App'x 771, 780 (5th Cir. 2021); *see also United States v. Huerta,* 252 F. App'x 694, 696 (5th Cir. 2007) (holding that the officer had reasonable suspicion in part because the

14

"videotape also shows Huerta's immediate exit from the vehicle and approach toward [the officer] after stopping his car."). As in the foregoing cases, Officer Jakobsohn, based on her experience, was concerned about Wright's attempt to separate himself from the vehicle for safety reasons and to possibly conceal evidence or criminal conduct. (Tr. at 47:10–48:5).

Accordingly, the Court finds that the circumstances surrounding Wright's immediate exit from his car support a finding that reasonable suspicion existed for an investigatory stop when the police pulled behind Wright and ordered him to remain in his vehicle.

### 4. Wright's Presence in a High Crime Area

Wright's presence in the Glen Arbor Park area also weighs in favor of finding reasonable suspicion in this case. As the Fifth Circuit has made clear, "A suspect's presence in a high crime area is also relevant." *Alexander v. City of Round Rock*, 854 F.3d 298, 304 (5th Cir. 2017) (citing *United States v. Rideau*, 969 F.2d 1572, 1575 (5th Cir. 1992) (en banc)). Here, Officer Jakobsohn had several years of experience and was very familiar with the area around Glen Arbor Park knowing it to be a high crime area with heavy drug dealing and use. (Tr. at 18:5–12, 18:21–19:8, 20:25–21:4, 21:8–17). In fact, Glen Arbor Park is such a high-crime area that she receives three or four calls per 10-hour shift about criminal activity in that area. (Tr. at 19:17–20:15). The information in the call summary log was consistent with her personal knowledge and experience that Glen Arbor Park was in an area known for heavy drug activity and high crime. In fact, it is undisputed that Wright was in a high-crime area known for drug dealing. *See United States v. Flowers*,

15

6 F.4th 651, 656 (5th Cir. 2021) ("[T]he fact that [the] stop occurred in a high crime area is among the relevant contextual considerations in a *Terry* analysis." (quoting *Wardlow*, 528 U.S. at 124, 120 S.Ct. at 676 (internal quotation marks omitted))).

Accordingly, this factor weighs heavily in favor of finding reasonable suspicion for an investigatory stop when the police pulled behind Wright and ordered him to remain in his vehicle.

### 5. The Collective Knowledge Doctrine

Although the Court believes the facts discussed thus far are sufficient to support a finding that reasonable suspicion existed when the Officer pulled behind Wright and ordered him to remain in his vehicle, the finding is only strengthened when the facts known to dispatch are imputed to Officer Jakobsohn.

"Reasonable suspicion to stop a vehicle, or probable cause to conduct a search, may arise through the collective knowledge of the officers involved in the operation." *United States v. Zuniga*, 860 F.3d 276, 282 (5th Cir. 2017) (citing *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013)). This "theory applies so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts." *Zuniga*, 860 F.3d at 283 (internal quotation marks omitted) (quoting *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007)). A single officer need not be fully aware of all the facts necessary to create reasonable suspicion. *See United States v. Kye Soo Lee*, 962 F.2d 430, 435–36 (5th Cir. 1992) ("[P]robable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest, when there is 'some degree of communication between the two.'" (quoting *United*

16

*States v. Ashley*, 569 F.2d 975, 983 (5th Cir. 1978), *cert. denied*, 439 U.S. 853, 99 S.Ct. 163, 58 L.Ed.2d 159 (1978))).

So, "reasonable suspicion can arise from information in the possession [of] one officer added to that in the possession of another officer with whom the first officer communicated." *United States v. Castaneda*, No. 1:21-CR-00031, 2021 WL 4079128, at *8 (N.D. Tex. Sept. 8, 2021) (citing *United States v. Gonzalez*, 637 F. App'x. 136, 137 (5th Cir. 2016) (holding that the collective knowledge of multiple officers can be added together as long as the officers communicated when considering whether an officer had reasonable suspicion)). For example, officers may conduct an investigatory stop in reliance on information issued through police channels, such as a wanted flyer or bulletin, or a radio dispatch, if the information is based on "articulable facts supporting a reasonable suspicion that the wanted person has committed an offense[.]" *United States v. Hensley*, 469 U.S. 221, 232, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985) (flyer or bulletin); *see, e.g., United States v. Cutchin*, 956 F.2d 1216, 1217–18 (D.C. Cir. 1992) (radio dispatch).

With the foregoing principles in mind, the caller in this case provided the following information to the police when he made his suspicious vehicle report:

> I told them that there was a gold Toyota Corolla that was at the pavilion doing a re-up, giving drugs to the transients that deal in that park and that they needed to come there and get them out of my park.

(Tr. at 16:19–22). Thus, the caller told the police dispatch officer that he was witnessing active drug dealing in his neighborhood in real-time. That information was synthesized down to the call summary log, which was communicated to Officer Jakobsohn by

17

dispatch. Officer Jakobsohn corroborated the make, model, and color of the car and found it in the location identified by the caller. The car was running and there were multiple occupants in the car, which is consistent with active contemporaneous drug activity, especially in that neighborhood.

Thus, under the collective knowledge doctrine and imputing the knowledge of dispatch to Officer Jakobsohn regarding the specific contents of the call, the Court finds that this additional factor weighs in favor of finding reasonable suspicion for an investigatory stop when the police pulled behind Wright and ordered him to remain in his vehicle.

### 6. The Credibility of the Caller

The Court finds that the testimony from the caller at the suppression hearing was credible about the content of his communication with dispatch. At the hearing, the Court informed the Government that "I'm not really sure that your anonymous caller helped you out very much . . . ." (Tr. at 61:6–7). That statement was based on two factors. One, the attitude of the caller in general at the hearing. Two, the Court was not aware of the collective knowledge doctrine at that time and believed that it was limited to considering only the contents of the call summary log, not the actual statement made by the caller to dispatch.

With respect to the first issue, it was evident to the Court that the caller was a reluctant witness at best. The caller had contacted the police repeatedly about the drug and crime problem in the park. (Tr. at 14:16–18). He felt threatened in his own neighborhood, (Tr. at 15:16–24), which gave context to his comment about having an AR-

18

15 and being willing to use it if threatened. (Tr. at 14:20–24, 16:23–25). When asked about what he had said to dispatch by counsel earlier in the hearing, the caller was curt and dismissive. He interrupted. (Tr. at 12:23–13:7, 15:5–12). He did not want to answer certain questions directly and had to be instructed to do so by the Court. (Tr. at 15:14–25). He then argued with the Court about whether he had answered the question. (Tr. at 16:1–3). In a somewhat tense exchange, the Court admonished the caller not to interrupt the Court. (Tr. at 15:25–16:5). Notwithstanding, the Court found the caller credible and believable despite his frustration and attitude.

With respect to the second issue, the Government had not directly pursued the collective knowledge doctrine at the suppression hearing. To be sure, the Government had argued that the Court should consider all of the evidence and consider the totality of the circumstances, but the Government had not argued that the Court should consider the contents of the comments made by the caller to dispatch. Notwithstanding, the Court finds that the collective knowledge doctrine applies. This is consistent with the Fifth Circuit's rule that it may "affirm the district court's ruling on a motion to suppress 'based on any rationale supported by the record.'" *United States v. Meals*, 21 F.4th 903, 906 (5th Cir. 2021), *cert. denied*, 143 S.Ct. 352, 214 L.Ed.2d 169 (2022) (quoting *United States v. Wise*, 877 F.3d 209, 215 (5th Cir. 2017)).

## IV. CONCLUSION

The Court finds that Officer Jakobsohn had a reasonable suspicion for the investigatory stop in this case when she pulled behind Wright and ordered him to remain in his vehicle. Based on the totality of the circumstances, the Court finds that Officer

Jakobsohn had a particularized and objective basis for suspecting Wright of criminal activity at that time.

In light of the foregoing, the Court finds that Defendant's Motion to Suppress should be **DENIED** and provides these Findings of Fact and Conclusions of Law in support of this holding as instructed by the Fifth Circuit.

It is SO ORDERED.

Signed on February 9, 2023.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**